UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY LEACH,

               Plaintiff,

     v.                                  Case No. 13-13571
                                         HON. TERRENCE G. BERG

CAROLYN W. COLVIN,

               Defendant.

_____/

ORDER DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (DKT. 15) AND GRANTING
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 18)</u>

     This is an action for judicial review of an adverse decision of the

Commissioner of Social Security brought pursuant to 42 U.S.C. §§ 405(g). Plaintiff

Kelly Leach suffers from severe anxiety. Plaintiff seeks a reversal of the

Commissioner's decision that she is not disabled and therefore not eligible for

supplemental security income ("SSI") under Title XVI of the Social Security Act,

codified at 42 U.S.C. § 1382(c)(3)(A). Plaintiff contends that the Administrative Law

Judge ("ALJ"): (1) made an erroneous credibility determination regarding Plaintiff's

statements about her symptoms; (2) failed to create an accurate Residual

Functional Capacity ("RFC") assessment encompassing all of Plaintiff's limitations;

and (3) erroneously determined at step five that Plaintiff could perform a range of

jobs at a medium exertion level. (Dkt. 15, p. 3.)

     This matter is before the Court on cross-motions for summary judgment.

Because substantial evidence supports the ALJ's decision, Plaintiff's motion for

summary judgment (Dkt. 15) will be DENIED and Defendant's motion for summary judgment (Dkt. 18) will be GRANTED.

The following facts are drawn from the administrative record:

## I.   FACTUAL BACKGROUND

### A.  Plaintiff's Medical History

Plaintiff Kelly Leach suffers from severe anxiety. Born in 1987, she was nearly 22 years of age on the alleged disability onset date of January 1, 2009. (*See* Tr. 139, 190.) In 2004, she was briefly hospitalized following a suicide attempt.[1] (Tr. 186.) On October 10, 2006, Plaintiff sought emergency room treatment because she believed that her heart was skipping beats. (Tr. 207.) Chest x-rays and laboratory results were normal. (*Id.*) On October 26, 2008, Plaintiff again sought emergency room treatment after she "took unprescribed Adderall to boost [her] energy" and reported experiencing heart palpitations. (Tr. 197-199.) Plaintiff was discharged less than two hours later without any recommended follow-up treatment after a physical examination was normal and her condition improved and stabilized. (*Id.*) On March 5, 2009, Plaintiff again sought treatment in the emergency room for anxiety and heart palpitations. (Tr. 193-196.) During this visit, Plaintiff admitted to taking "[V]icodent [sic] for a year," but left before any medical screening was done.

---

[1] There are no medical records available from this hospitalization, but Plaintiff testified in the hearing that she had attempted suicide in 2004 (Tr. 8-9), and included the same information in her pre-hearing brief (Tr. 186). There is also a reference to a "2004 attempted suicide" in Plaintiff's Community Care Services treatment notes. (Tr. 277.) Moreover, the ALJ credited this information and considered it in his decision. (Tr. 21-22.)

(Tr. 195.) On June 26, 2009, Plaintiff was prescribed Xanax[2] for her anxiety. (Tr. 222.)

On October 15, 2010, Plaintiff appeared for a consultative psychological examination with Dr. Hugh D. Bray at the request of the State of Michigan's Disability Determination Service ("DDS"). (Tr. 223-228.) Plaintiff was referred for a "psychological assessment to determine current strengths in intellectual and cognitive skills." (Tr. 223.) Dr. Bray had one session with Plaintiff and based his assessment primarily on Plaintiff's own comments and "supportive documentation…in the form of Form 3373, Oakwood Hospital." (*Id.*) Dr. Bray noted that it was "[very] difficult to get info" from Plaintiff because "[s]he just sits and cries." (*Id.*) Plaintiff responded to most of Dr. Bray's questions by stating that she did not know the answer. (Tr. 223-228.) Plaintiff did tell Dr. Bray, however, that she was not able to work because she was afraid. (Tr. 224.)

Although Dr. Bray could not solicit much information from Plaintiff, he concluded that Plaintiff's ability to relate to others and her ability to understand, remember and carry out tasks was significantly impaired. (Tr. 227.) Moreover, Plaintiff's ability to cope with the stress of day-to-day work activities was severely impaired and her ability to maintain attention and concentration was moderately impaired. (*Id.*) Dr. Bray diagnosed Plaintiff with an anxiety disorder, a "Brief Psychotic Disorder with Emotional Stress," and a history of Vicodin dependence.

---

[2] Xanax is the trade name for alprazolam, a drug prescribed for managing anxiety disorders and for the short-term relief of anxiety. Pfizer, *Medical Information: Xanax (alprazolam)*, https://www.pfizermedicalinformation.com/sites/pmi/Pages/medicalinfo.aspx?productId=XANAX-PMI0211 (last visited February 9, 2015).

(*Id.*) In addition, Dr. Bray noted that Plaintiff had a history of non-compliance with treatment. (*Id.*) Finally, Dr. Bray assigned Plaintiff a Global Assessment of Functioning ("GAF") score[3] of 20. (*Id.*)

Plaintiff filed an initial claim for disability on June 30, 2010 alleging that she was disabled due to her anxiety. (Tr. 139-142.) On November 2, 2010, Dr. Benetta E. Johnson, on behalf of DDS, reviewed Plaintiff's medical record including Dr. Bray's assessment, and determined that Plaintiff was not disabled. (Tr. 90-99.) Dr. Johnson found that Plaintiff was only mildly restricted in activities of daily living but had moderate difficulty maintaining concentration and marked difficulty maintaining social function. (Tr. 93.) Moreover, Dr. Johnson found that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of her symptoms were "limited in credibility" because her statements were contradicted by the objective medical evidence. (Tr. 94.) Dr. Johnson concluded that Plaintiff's anxiety resulted "in some limitations in [her] ability to perform work related activities but does not prevent [her] from working." (Tr. 98.)

On April 1, 2011, Plaintiff was referred to Community Care Services ("CCS") for mental health treatment. (Tr. 268-280.) Plaintiff's initial diagnostic summary

---

[3] A Global Assessment of Functioning or GAF score represents the examiner's judgment of the individual's overall level of psychological functioning on a scale of 0-100. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Health Disorders* 32-34 (4th ed. 2000). Individuals with a GAF score of 20 are classified as having "some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication." *Id.* The current fifth edition of the Diagnostic and Statistical Manual of Mental Disorders omits the GAF scale, but the Social Security Administration continues to consider the scale if submitted as evidence of loss of mental function – although not determinative evidence and with certain limitations because the "GAF is neither standardized nor based on normative data." *See* SSA AM-13066, p. 3 (July 22, 2013 internal guidance memo that allows the use of the GAF scale while noting its limitations).

notes reveal that she presented with early-onset Schizophrenia with auditory and visual hallucinations, delusions, paranoia, a preoccupation with religion, and isolation. (Tr. 279.) Plaintiff's preliminary treatment plan recommended an orientation meeting, a psychiatric evaluation, and then ongoing therapy. (Tr. 267.)

After her initial evaluation, Plaintiff had regular meetings with a therapist at CCS. On May 31, 2011, Dr. Keum Kang noted that Plaintiff had not been properly treated "until now," and advised Plaintiff to taper off Xanax and to begin taking Risperdal.[4] (Tr. 264-265.) Dr. Kang assigned Plaintiff a GAF score of 45.[5] (Tr. 248.) Plaintiff saw Dr. Judy Russell on June 15, 2011 and admitted that she had not yet begun to take the Risperdal because she was afraid to pick it up from the pharmacy. (Tr. 260.) On June 27, 2011, Plaintiff again saw Dr. Russell and conveyed her fear that her brother would leave her because he had lost his job. (Tr. 256.) Dr. Russell established a series of goals for Plaintiff to reduce her body fatigue, paranoia and hallucinations, and to increase independence. (Tr. 258.) Dr. Russell noted that it was difficult to determine whether Plaintiff's fears and anxieties were actually paranoid. (Tr. 258.)

During her July 11, 2011 session with Dr. Russell, Plaintiff reported that she had been taking her medication every night and that her brother made certain that

---

[4] Risperdal is a medication "approved for the treatment of schizophrenia and for the maintenance treatment of Bipolar I Disorder." Janssen, *Risperdal® Consta®*, http://www.risperdalconsta.com/ (last visited Feb. 9, 2015).

[5] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Health Disorders* 32-34 (4th ed. 2000). In this Circuit, a GAF score of 45-50 is consistent with ability to "hold at least some jobs in the national economy." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007).

she was in compliance. (Tr. 243.) Plaintiff noted that her mental state had improved, that there was less "screaming" in her head, and Dr. Russell observed that Plaintiff "appeared less fearful." (Tr. 243-244.) On July 28, 2011, Plaintiff told Dr. Russell that she wanted to get better and that she had adopted a cat. (Tr. 240.) Although Plaintiff reported a slight increase in hallucinations and paranoia, she was still taking her medication as prescribed and Dr. Russell concluded that Plaintiff was making "some progress." (Tr. 241.)

The most recent therapy session noted in the record was on August 24, 2011, again with Dr. Russell. (Tr. 238.) Plaintiff had again made "some progress" and reported less psychoses. (Tr. 237.) Plaintiff admitted that she was still sometimes afraid to take her medication and was experiencing nightmares, but she continued to take her medication and stated that it helped. (Tr. 236.)

## B. Administrative Proceedings

Plaintiff filed the instant claim for supplemental security income on June 30, 2010, alleging disability beginning on January 1, 2009. (Tr. 139-142.) The claims were initially denied by the Commissioner on November 4, 2010. (Tr. 100-103.) On November 16, 2010, Plaintiff filed a written request for a hearing before an ALJ. (Tr. 104.) Plaintiff appeared with counsel on September 9, 2011 before ALJ James N. Gramenos, who considered the case de novo. (Tr. 32-35.)

In a decision dated January 25, 2012, the ALJ found that Plaintiff was not disabled. (Tr. 13-30.) Plaintiff requested a review of this decision on March 20, 2012. (Tr. 11-12.) The ALJ's decision became the final decision of the Commissioner when

the Appeals Council, on May 14, 2013, denied Plaintiff's request for review. (Tr. 4-6.); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

## C. ALJ Findings

Plaintiff was 24 years old on the date of the hearing. (*See* Tr. 139, 225.) Plaintiff had no past relevant work experience. (Tr. 26.) The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 17-18.) At step two, the ALJ found that Plaintiff's anxiety disorder was "severe" within the meaning of the second sequential step. (Tr. 18.) At step three, the ALJ found no evidence that Plaintiff's impairment met or equaled one of the listings in the regulations. (*Id.*)

The ALJ determined that Plaintiff has the following Residual Functional Capacity or "RFC":

> Capability of speaking and understanding the English language; capability to mentally function in an unskilled work activity that does not require exposure to high levels of stress defined as such that would be expected in occupations that require in person with the general public or actual moving assembly line job and not bench assembly type job; work limited to simple, unskilled work with 1, 2, or 3 step instructions; basic mental ability to understand, carry out and remember simple, unskilled work instructions; learn 1-3 step jobs through instruction in English language and/or demonstration; retains mental functional ability to respond appropriately to supervision in performing unskilled work activity; eliminate jobs that require the worker to be responsible for assigned work tasks within specific job requirements mandate the worker to be functioning as a team member; has mental functional ability to respond appropriately to usual work situations and with co-workers in performing unskilled work activity; has the mental functional ability to deal with changes in a routine work setting; eliminate from consideration jobs that have hazards in the work setting including unprotected areas of moving

7

machinery, heights. [sic] hazards, ladders, ramps, ropes, and unprotected areas in the workplace.

(Tr. 20-21.) At step four, the ALJ found that the transferability of job skills was not an issue in this case because Plaintiff does not have any past relevant work experience. (Tr. 26.) At step five, the ALJ denied Plaintiff benefits because she could perform jobs at medium exertion levels "that exist in significant numbers in the national economy." (Tr. 26-27.)

## D. Plaintiff's Claims of Error

Plaintiff alleges three claims of error: (1) the ALJ failed to properly evaluate Plaintiff's credibility; (2) the ALJ failed to create an accurate RFC assessment encompassing all of Plaintiff's limitations; and as a result (3) the ALJ erroneously found that Plaintiff was capable of performing work at step five of the sequential analysis.[6] (Dkt. 15, p. 7.)

First, Plaintiff argues that the ALJ failed to properly evaluate her credibility. (*Id.*) The ALJ found that although Plaintiff's impairment "could reasonably be expected to cause the alleged symptoms," Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the RFC assessment. (Tr. 59.) Plaintiff contends, however, that based on the objective medical evidence, the ALJ should have determined that Plaintiff's statements regarding her symptoms were credible.

---

[6] Plaintiff's motion for summary judgment states her third claim as "The ALJ Erroneously Found Work at Step Four." (Dkt. 15, p. 7.) The determination of whether a claimant can perform any job that exists in significant numbers in the national economy, however, is made at *step five* of the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920. As explained below, however, the Court will treat this claim as a challenge to the ALJ's finding at step four.

8

Plaintiff argues that the medical records during the relevant time period reveal her "on-going limitations" from "debilitating anxiety." (Dkt. 15, p. 5.) Plaintiff notes that she was diagnosed with anxiety and paranoia by Dr. Hugh D. Bray. (Tr. 223-228.) At the assessment, Dr. Bray observed that Plaintiff "just sits and cries," gave little information when asked questions, and wanted to leave. (Tr. 223, 226.) Plaintiff often answered questions by simply stating "no," "I can't help you," or "I want to leave." (Tr. 223-228.)

After Dr. Bray's examination, Plaintiff underwent outpatient treatment through CCS beginning on April 1, 2011. (Tr. 268.) Plaintiff received services for paranoid schizophrenia as well as anxiety and depression. (Tr. 248, 265.) Plaintiff states that she was experiencing a lack of motivation and difficulty sleeping. (Tr. 247.) Plaintiff notes that she was still "hearing voices and feeling paranoid" at her July 28, 2011 treatment session.[7] (Tr. 239.) Plaintiff argues that these records are consistent with her testimony at the hearing that she suffers from chronic anxiety that makes it difficult for her to function on a daily basis and limits her ability to concentrate.

Plaintiff argues, as her second and third claims of error, that the ALJ erroneously found Plaintiff capable of performing work at step five of the sequential analysis because the ALJ's RFC assessment fails to encompass all of her mental limitations. (Dkt. 15, p. 6.) Plaintiff argues that her medical records and supporting

---

[7] This was not Plaintiff's most recent treatment session. She had a subsequent session in August 2011 when she reported continued compliance with her treatment and "less psychoses" and the therapist noted that Plaintiff was making "more progress." (Tr. 238.)

testimony, as outlined above, show that she is unable to work.[8] (*Id.* at 7-8.) According to Plaintiff, this evidence demonstrates that she has a much more limited ability to concentrate and to maintain a daily routine than the RFC assessment reflects. (*Id.* at 8.) Plaintiff concludes that the failure of the ALJ to create an accurate hypothetical encompassing Plaintiff's limitations is not "harmless error" and thus a reversal and immediate award of benefits is appropriate here. (*Id.* at 8-9.)

## E. Commissioner's Motion for Summary Judgment

The Commissioner argues that the ALJ reasonably assessed the evidence and fully accommodated the limiting effects of Plaintiff's impairments by restricting Plaintiff to a reduced range of medium, unskilled work in the RFC assessment. (Dkt. 18, pp. 7-11.) The Commissioner contends that in doing so, the ALJ reasonably discounted Plaintiff's allegations of greater limitations because they were inconsistent with the objective and opinion medical evidence, Plaintiff's daily activities, the conservative treatment Plaintiff received for her impairments, her sparse treatment history, and her improvement once she began consistent psychiatric treatment. (*Id.* at 7-10.)

The Commissioner observes that in challenging the ALJ's assessment of her credibility and the RFC assessment, Plaintiff relies exclusively on Dr. Bray's

---

[8] Plaintiff's motion for summary judgment offers only sparse legal analysis and poorly developed consideration of the evidence. In support of her first claim of error, Plaintiff includes only two short paragraphs summarizing an examination by Dr. Bray and some conclusions from the Community Care Services treatment notes. (Dkt. 15, pp. 5-6.) In support of her second and third claims of error, Plaintiff simply inserts the same two paragraphs offered in support of her first claim of error, adding just two sentences of legal analysis. (*Id.* at 5-6, 7-8.) The motion fails to consider or discuss any other evidence in the record, or refer to Plaintiff's own testimony at the hearing or to specific examples of the ALJ's reasoning.

examination and her CCS treatment notes. (*Id.* at 9-10.) Plaintiff does not challenge the bulk of the evidence upon which the ALJ relied, including Dr. Johnson's assessment, Plaintiff's emergency room treatment records, or indications in the CCS treatment notes that Plaintiff was improving with treatment. The Commissioner argues that because substantial evidence supports the ALJ's decision, this Court must affirm it. *See Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (reviewing court must affirm even if substantial evidence could also support a contrary result).

The Commissioner contends that when assessing Plaintiff's RFC, the ALJ "incorporated significant limitations that gave Plaintiff the benefit of the doubt." (Dkt. 18, pp. 7-8.) The limitations incorporated by the ALJ, the Commissioner notes, exceed even those assessed by Dr. Johnson after reviewing Plaintiff's medical history for the state disability determination service. (*Id.* at 4, 8.) The ALJ accommodated the limiting effects of Plaintiff's impairment by restricting Plaintiff to medium, unskilled work that: (1) does not involve face-to-face interaction with the general public; (2) does not involve moving assembly lines; (3) does not involve working as a member of a team; (4) does not involve any exposure to workplace hazards; (5) involves simple instructions or tasks with one to three steps; (6) requires "appropriate" response to supervision, work situations, and co-workers; and (7) involves routine changes in the work setting. (*Id.* at 8.)

The ALJ's assessment that Plaintiff can perform work of medium exertion, the Commissioner maintains, is consistent with the medical evidence showing improvement with conservative treatment. (*Id.* at 9.) As the ALJ recounted,

Plaintiff was hospitalized in October 2008 because she ingested Adderall pills prescribed for another person (Tr. 199), but Plaintiff improved after she was discharged. (Tr. 23.) No follow-up treatment or medication was prescribed because Plaintiff's examination findings were normal. (Tr. 201-202.)

When Plaintiff did seek psychiatric treatment in 2011, the Commissioner notes that the sparse treatment record shows how Plaintiff improved after her initial evaluations when she started taking the recommended medication. (Tr. 237, 243-245.) As the ALJ observed, Plaintiff was treated conservatively with therapy and medication. (Tr. 25.) The Commissioner asserts that a conservative treatment regimen is inconsistent with a finding of total disability in this Circuit. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Kunna v. Comm'r of Soc. Sec.*, 2012 WL 3111635, at *17 (E.D. Mich. June 26, 2012) ("As to psychological treatment, Plaintiff was never hospitalized for depression and instead received only conservative or modest treatment, such as therapy and prescription medication, which is inconsistent with a finding of disability.")

The Commissioner argues that Plaintiff unpersuasively relies exclusively on Dr. Bray's consultative examination and the initial evaluations at CCS to support her claim that the ALJ erred in assessing her credibility and creating her RFC assessment. (Dkt. 18, p. 9.) The Commissioner maintains that the ALJ was reasonable in discounting Dr. Bray's findings because they were based almost entirely on Plaintiff's subjective complaints. (*Id.* at 8.) Even a treating physician's opinion may be discounted if it is unduly based on a claimant's subjective

12

complaints. *See McCoy ex rel. McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir. 1995.)

The ALJ was also reasonable in discounting Plaintiff's CSS treatment notes. After beginning treatment at CCS, Plaintiff's symptoms consistently improved and neither Plaintiff's therapists nor her psychiatrist indicated that Plaintiff had any limitations beyond those that the ALJ assessed. (Tr. 237, 243-245.)  Moreover, Dr. Johnson reviewed the entire record including Dr. Bray's examination and the CCS treatment notes and concluded that Plaintiff was not disabled and that she retained the ability to perform simple tasks. (Tr. 93-98.)

Plaintiff's challenge to the ALJ's assessment of her credibility is predicated on the same pre-treatment evidence of her impairment on which she based her challenge to the RFC assessment, the Commissioner asserts. (Dkt. 18, p. 10.) Plaintiff fails to challenge any of the evidence the ALJ relied on in support of his decision to discount her allegations of additional limitations. (*Id.*) Such evidence includes: (1) Dr. Johnson's reviewing opinion; (2) documented improvement reflected in the CCS treatment notes; and (3) the conservative nature of Plaintiff's treatment. (*Id.*) In light of applicable regulations, the Commissioner maintains that the ALJ properly considered the evidence. *See* 20 C.F.R. §§ 416.929(c)(2) (objective medical evidence), (c)(3)(iv) (effectiveness of medication), and (c)(3)(v) (treatment other than medication). The Sixth Circuit accords great deference to an ALJ's credibility assessment, particularly because the ALJ has the opportunity to observe the demeanor of a witness while testifying.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  It is not the province of reviewing courts to decide

questions of credibility.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  Thus the ALJ's credibility determination should not be disturbed, the Commissioner argues.

Finally, because Plaintiff's challenge to the ALJ's determination that she can perform work at a medium exertion level is predicated entirely on her challenge to the ALJ's RFC and credibility assessments, the latter challenge fails for the same reasons as the former. (Dkt. 18, p. 12.) Given that the ALJ's RFC assessment was valid and that the ALJ's hypothetical questions for the vocational expert accurately incorporated the RFC findings, the ALJ was thus entitled to rely on the vocational expert's testimony when determining whether Plaintiff could work. The ALJ's decision the Plaintiff is not disabled was therefore based on substantial evidence, the Commissioner concludes, and should be affirmed.

## II.   DISCUSSION

### A. Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious.  *Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is

not found during this administrative review process, the claimant may file an action in federal district court. *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir.1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters*, 127 F.3d at 528 (6th Cir. 1997).

In deciding whether substantial evidence supports the ALJ's decision, the reviewing court does not "try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones*, 336 F.3d at 475 (an "ALJ is not required to accept a claimant's subjective complaints and may ... consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds

contradictions among medical reports, claimant's testimony, and other evidence.").
"However, the ALJ is not free to make credibility determinations based solely upon
an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d
at 247 (quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4).

If supported by substantial evidence, the Commissioner's findings of fact are
conclusive.  42 U.S.C. § 405(g).  Therefore, this Court may not reverse the
Commissioner's decision merely because it disagrees or because "there exists in the
record substantial evidence to support a different conclusion."  *McClanahan v.
Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen*, 800 F.2d at 545 (6th
Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla of evidence but
less than a preponderance; it is such relevant evidence as a reasonable mind might
accept as adequate to support a conclusion."  *Rogers*, 486 F.3d at 241; *Jones*, 336
F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of
choice' within which the Commissioner may proceed without interference from the
courts."  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted)
(citing, *Mullen*, 800 F.2d at 545).

The scope of this Court's review is limited to an examination of the record
only.  *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).
When reviewing the Commissioner's factual findings for substantial evidence, a
reviewing court must consider the evidence in the record as a whole, including that
evidence which might subtract from its weight.  *Wyatt v. Sec'y of Health & Human
Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of appeals and the district

16

court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x. 521, 526 (6th Cir. 2006).

## B. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq*.). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental

impairment which can be expected to result in death or
which has lasted or can be expected to last for a
continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also* 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined

through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in
> substantial gainful activity, benefits are denied without
> further analysis.
>
> Step Two:  If the claimant does not have a severe
> impairment or combination of impairments, that
> "significantly limits ... physical or mental ability to do
> basic work activities," benefits are denied without further
> analysis.
>
> Step Three:  If plaintiff is not performing substantial
> gainful activity, has a severe impairment that is expected
> to last for at least twelve months, and the severe
> impairment meets or equals one of the impairments listed
> in the regulations, the claimant is conclusively presumed
> to be disabled regardless of age, education or work
> experience.
>
> Step Four:  If the claimant is able to perform his or her
> past relevant work, benefits are denied without further
> analysis.
>
> Step Five: Even if the claimant is unable to perform his or
> her past relevant work, if other work exists in the
> national economy that plaintiff can perform, in view of his
> or her age, education, and work experience, benefits are
> denied.

20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner

makes a dispositive finding at any point in the five-step process, the review

terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

If the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

## C. Analysis

### 1. The ALJ's credibility determination is supported by substantial evidence

Plaintiff argues that the ALJ's credibility analysis is flawed because it is not based on a proper characterization of the record evidence. (Dkt. 15, pp. 4-6.) Credibility determinations concerning a claimant's subjective complaints, however, are peculiarly within the province of the ALJ. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). "It [i]s for the [Commissioner]

and his examiner, as the fact finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony." *Heston*, 245 F.3d at 536 (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972)).

As the Sixth Circuit has held, determinations of credibility related to subjective complaints rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (citation omitted). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

The ALJ is not required to accept the testimony of a claimant if it conflicts with medical reports, the claimant's prior statements, the claimant's daily activities, and other evidence in the record. *See Walters*, 127 F.3d at 531. Rather, when a complaint of pain or other symptoms is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. SSR 96-7p, 1996

WL 374186, at *1; see also 20 C.F.R. § 404.1529. Consistency between the plaintiff's subjective complaints and the record evidence 'tends to support the credibility of the [plaintiff], while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x. 852, 863 (6th Cir. 2011).

Having reviewed the record, the Court concludes that the ALJ's finding that the objective record evidence does not support Plaintiff's claim of a disabling limitation is supported by substantial evidence. The ALJ's credibility determination is thorough, detailed, and amply supported by the record. The ALJ properly examined the objective medical opinion evidence, including assessments by Dr. Johnson, Dr. Kang, and Dr. Russell, as well as Plaintiff's daily activities, her conservative treatment, Plaintiff's sparse treatment history, her failure to comply with treatment recommendations, and her improvement with consistent therapy and medication and found that this evidence undermined the claimed severity of Plaintiff's symptoms. (Tr. 21-26.) As the Commissioner correctly observes, all of these considerations were appropriate under the relevant regulations. *See* 20 C.F.R. § 404.1529(c)(2) (objective medical evidence), (c)(3)(I) (daily activities), (c)(3)(iv) (effectiveness of medication), (c)(3)(v) (treatment other than medication), and (c)(3)(vi) (other factors).

The ALJ outlined Plaintiff's treatment history, starting with Plaintiff's testimony that she first received treatment for her mental problems only a few months prior to the hearing. (Tr. 21.) The ALJ acknowledged that Plaintiff suffered

from "screaming going on in her head" and constant fear and isolation, but noted that Plaintiff was fairly independent; she had a valid driver's license and could drive to her appointments alone. (Tr. 21-22.) Plaintiff could also take care of her own personal hygiene and grooming, prepare cereal for herself or purchase a sandwich from the store, and shop for groceries. (Tr. 19.) Moreover, Plaintiff's emergency room visits did not result in hospitalization as "objective testing was within normal limits" and Plaintiff "admitted that her symptoms had improved upon discharge." (Tr. 22.)

The ALJ then examined Dr. Bray's assessment of Plaintiff, but discounted this evidence. (Tr. 23.) Dr. Bray noted that although Plaintiff could perform activities of daily living independently, she had poor grooming and a faulty contact with reality. (*Id.*) Plaintiff was anxious at the examination, and appeared depressed. (*Id.*) Dr. Bray opined that Plaintiff's prognosis was poor and assessed her with a GAF score of 20. (*Id.*) Because Plaintiff was not able to perform simple, repetitive tasks, Dr. Bray questioned her ability to maintain attention and withstand the stress associated with everyday work activities. (*Id.*) Although the ALJ provided a detailed summary of Dr. Bray's assessment, the ALJ ultimately gave less weight to Dr. Bray's findings because they were based on "a one-time examination" of Plaintiff and on Plaintiff's subjective complaints. (*Id.*) Moreover, Dr. Bray had very little information from Plaintiff upon which to base his

22

conclusions given that she rarely responded to any of his inquiries during the assessment.[9]

The ALJ also considered and credited Dr. Johnson's assessment of Plaintiff's medical history. (Tr. 25.) Dr. Johnson reviewed all of Plaintiff's medical records including Dr. Bray's assessment and concluded that Plaintiff had: (1) a mild restriction of daily living activities; (2) marked difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence or pace; with (4) no evidence of repeated episodes of decompensation. (*Id.*) Plaintiff could remember and carry out simple tasks and could relate to others, at least on a superficial basis. (*Id.*) If Plaintiff is compliant with her treatment and consistent with her therapy, she has the ability to engage in work and function independently. (Tr. 25-26.)

In addition, the ALJ thoroughly reviewed the CCS treatment notes and acknowledged that Plaintiff "contends with a severe mental impairment," but that her symptoms improve when she takes her medication as prescribed. (*Id.*) Impairments that are controlled by medication are not disabling. *See Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 836 (6th Cir. 2005) ("[T]here is no objective evidence which suggests that the [claimant's] headaches are so severe that they would keep her from working so long as she takes medication.").

---

[9] Although Plaintiff was fairly responsive to her own attorney's questions during the hearing, Plaintiff was often nonresponsive to the ALJ's questions. (*See* Tr. 35-79.) For example, when the ALJ tried to ascertain what Plaintiff had been doing from the ages of 18 to 21, Plaintiff said that she did not understand what the ALJ meant and that she went "from place to place." (Tr. 52.) The ALJ also had difficulty establishing what Plaintiff's daily routine was. (*See* Tr. 55-56.) The ALJ concluded his examination by remarking to Plaintiff's counsel that Plaintiff had "not been responsive." (Tr. 66.)

The ALJ also discussed Plaintiff's GAF score of 45 assessed at CCS, noting that such a score "cannot be used in isolation from the rest of the evidence" and regardless it "is consistent with the ability to engage in work." (Tr. 24.) In this Circuit, a GAF score of 45-50 is consistent with ability to "hold at least some jobs in the national economy." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007). The ALJ further explained that he did not give the CCS assessments significant weight because they represented Plaintiff's "condition prior to the benefit of medication and consistent treatment." (*Id.*) Plaintiff's treatment regimen, the ALJ observed, was "identified as conservative." (Tr. 25.) Conservative treatment, like impairments that can be controlled with medication, is also inconsistent with a finding of total disability. *See Helm*, 405 F. App'x at 1001.

The ALJ also noted that Plaintiff had not suffered any prolonged periods of decompensation. (Tr. 20.) Episodes of decompensation are increases in symptoms as a result of difficulties in performing daily activities, maintaining social relationships, or maintaining concentration. (*Id.*) Plaintiff was able to attend her consultative examination with Dr. Bray, all her sessions with CCS, and the hearing without decompensating. (*Id.*) In addition, Plaintiff has never been hospitalized due to her mental impairments. (*Id.*) Therefore, the ALJ concluded, Plaintiff is able to function independently despite her testimony to the contrary and there is no evidence that she has not been able to cope with "even a minimal increase in mental demands or change in environment." (*Id.*)

24

Against the extensive support the ALJ provided for discounting Plaintiff's credibility, Plaintiff provides only two short paragraphs of sparse references to Dr. Bray's assessment and the CCS treatment notes (which the ALJ specifically addressed) without any specific examples of how the ALJ's reasoning is flawed. (Dkt. 15, pp. 5-6.) Plaintiff states that she "suffers from severe anxiety" and as a result "sits and cries during most of the day and is scared of everything." (*Id.*) During her session with Dr. Bray, Plaintiff wanted to leave and could not answer many of Dr. Bray's questions. (*Id.*) Plaintiff notes that at CCS, she received treatment for "anxiety, depression, racing thoughts and paranoia" and exhibited a lack of motivation and a desire to sleep. (*Id.*) Plaintiff asserts that she continues to hear voices and feel paranoid. *(Id.)*  Plaintiff does not challenge or even acknowledge any of the other evidence relied on by the ALJ in his five-page review of Plaintiff's medical history and testimony, including Dr. Johnson's evaluation credited by the ALJ. (Tr. 21-26.)

Plaintiff disagrees with the ALJ's evaluation of this evidence, but it is the province of the ALJ to make credibility determinations and Plaintiff provides no compelling reason to disturb the ALJ's credibility determination. The ALJ credited Dr. Johnson's assessment and the CCS therapists' diagnoses and indications of improvement, evaluated the extent to which the severity of Plaintiff's symptoms could reasonably be accepted as consistent with the medical evidence, and found Plaintiff's testimony about the extent of her limitations not fully credible. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great

weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters*, 127 F.3d at 531. The Court concludes that there is substantial evidence in the record to support the ALJ's credibility findings and conclusion that Plaintiff's impairments do not preclude her from performing the identified jobs.

## 2. The ALJ's RFC Assessment and Step Five Finding are supported by Substantial Evidence

Plaintiff complains that the ALJ did not include all of her limitations in his RFC assessment because the ALJ did not properly determine the scope and severity of Plaintiff's anxiety symptoms. (Dkt. 15, pp. 7-8.) As a result, the ALJ erroneously determined at step five in the sequential analysis that Plaintiff could perform work at moderate exertion levels. (*Id.*) Plaintiff does not, however, develop any argument in her brief addressing why the ALJ's conclusion at step five is erroneous, focusing instead on the RFC assessment. As a result, the Court concludes that Plaintiff is solely attempting to refute the RFC finding. *See Kirchner v. Colvin*, 2013 WL 5913972, at *11 (E.D. Mich. Nov.4, 2013) ("Kirchner's Step Five argument is a veiled attack on the ALJ's underlying RFC finding" because "this is not a scenario where the ALJ's hypothetical failed to match up to the RFC he ultimately imposed.").

As the Commission accurately observes, Plaintiff's argument concerning the ALJ's RFC assessment essentially mirrors her argument regarding the ALJ's credibility assessment. (*See Id.* at 5-8.) First, Plaintiff does not challenge any of the evidence upon which the ALJ relied, and instead restates the same two short

paragraphs of sparse references to Dr. Bray's assessment and her CCS treatment notes that Plaintiff offered in support of her challenge to the ALJ's credibility assessment. (*Id*.) Then, Plaintiff adds two broad claims representing the only legal analysis in her entire brief:

> As a result of these limitations, Plaintiff would have a more limited ability to concentrate and maintain a regular schedule, as would be required at her place of employment. Furthermore, the symptoms of Plaintiff's mental health impairment frequently interfere with her ability to perform even daily activities – let along [sic] a [sic] full-time employment.

(*Id*. at 8.) Plaintiff does not provide any further detail regarding which specific symptoms "frequently interfere" with which of Plaintiff's daily activities and how this would prevent her from working at any job. Plaintiff does not link her analysis with the the record evidence she relies on, and fails to cite any specific examples of her own testimony or the ALJ's reasoning that might support her argument.

Plaintiff appears to predicate her challenge to the RFC assessment primarily on evidence of her diagnosis. Plaintiff states that she "suffers from debilitating anxiety" and that she was "diagnosed with anxiety and paranoia." (Dkt. 15, p. 7-8.) Plaintiff emphasizes that she received services for "anxiety, depression, racing thoughts and paranoia" at CCS. (*Id*. at 8.) These diagnoses by themselves, however, are not sufficient evidence to support a conclusion that Plaintiff is limited in any particular way. A certain condition or diagnosis does not equate to disability or a particular RFC.

Rather, the RFC assessment circumscribes "the claimant's residual abilities or what the claimant can do, not what maladies a claimant suffers from-though his maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002). "A claimant's severe impairment may or may not affect his or her functional capacity to work. One does not necessarily establish the other." *Yang v. Comm'r of Soc. Sec.*, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004). Thus, the mere existence of any condition from which Plaintiff may have suffered does not necessarily establish any functional limitation or disability.  The functional limitation considers whether the Plaintiff is able to perform some type of work even in light of the medical condition that the Plaintiff has.

As noted above, the ALJ did consider Dr. Bray's assessment and the CCS treatment notes and explained why he did not afford them greater weight. (Tr. 23-24.) To the extent Plaintiff is arguing that the ALJ's RFC determination is in error because that determination does not include all of Plaintiff's subjective testimony, that argument is unavailing, as "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability," and "can present a hypothetical to the [vocational expert] on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate." *Jones*, 336 F.3d at 476. The ALJ discussed and evaluated all the record evidence, including the opinion testimony of each of the examining therapists, Plaintiff's recent treatment, and the Plaintiff's testimony

28

about her limitations, and explained that the medical evidence of record does not suggest limitations greater than those articulated in the RFC assessment.

In fact, the ALJ's RFC assessment includes greater limitations than Dr. Johnson's assessment of Plaintiff's medical history recommends. For example, Dr. Johnson classified Plaintiff's ability to interact with co-workers as moderately limited (Tr. 93-94) whereas the ALJ eliminated from the RFC assessment all jobs requiring Plaintiff to work with others as a team (Tr. 20-21). In addition, the ALJ limited Plaintiff to simple work requiring no more than 1, 2, or 3-step instructions (Tr. 20), while Dr. Johnson concluded that Plaintiff had moderate ability to follow detailed instructions (Tr. 94). The ALJ accommodated Plaintiff's limitations by limiting Plaintiff to a range of moderate exertional work. Thus, while the record evidence indicates that Plaintiff does have severe impairments, as noted by the ALJ, it does not specifically support Plaintiff's testimony regarding the extent of her limitations. Indeed, as explained above, there is evidence to support the ALJ's finding that Plaintiff was not fully credible.

Because the ALJ reached his decision using correct legal standards and because those findings were supported by substantial evidence, the Court must affirm it, even if reasonable minds could disagree on whether the individual was disabled or substantial evidence could also support a contrary result.  *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *see also Longworth*, 402 F.3d at 595 ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have

supported an opposite conclusion.").  In this case, the ALJ's decision is supported by substantial evidence.

### III.    CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (Dkt. 15) is **DENIED**. The Commissioner's Motion for Summary Judgment (Dkt. 18) is **GRANTED** and the Commissioner's findings are **AFFIRMED**.

**SO ORDERED.**

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  February 10, 2015

### Certificate of Service

I hereby certify that this Order was electronically submitted on February 10, 2015, using the CM/ECF system, which will send notification to each party.

By:  s/A. Chubb
Case Manager

30